IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Adam Peterson, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **ORDER RE MOTIONS** |
| vs. | ) **IN LIMINE** |
| | ) |
| Murex Petroleum Corporation, | ) |
| Mickey Peck, company man, | ) |
| Stokes and Spiehler, | ) |
| Earl Britzenhoff, Company Man, and | ) |
| Phoenix Operating Company, | ) Case No.1:17-cv-165 |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| Murex Petroleum Corporation, | ) |
| | ) |
| Defendant and | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| WISCO, Inc., | ) |
| | ) |
| Third-Party Defendant. | ) |

I. **BACKGROUND**

In this action, plaintiff Adam Peterson ("Peterson") is suing to recover damages for an injury he sustained on April 15, 2012, while working as a derrick hand for third-party defendant WISCO, Inc. ("WISCO"). At the time of the accident, WISCO was doing rehabilitative work on an oil well operated by defendant and third-plaintiff Murex Petroleum Corporation ("Murex"). Plaintiff was injured when his arm became entangled in the rods while he was in a basket up in the derrick.

In addition to contracting with WISCO to perform the rehabilitative work, Murex engaged

1

the services of two companies who each provided a person to represent Murex at the wellsite with respect to the work being performed by WISCO. In oilfield parlance, the onsite representative for Murex is referred to as the "company man." One of the firms that Murex engaged to provide it with a company man was defendant Phoenix Operating Company ("Phoenix"). The individual retained by Phoenix for this purpose was defendant Earl Britzenhoff ("Britzenhoff"). The other firm engaged by Murex was defendant Stokes and Spiehler ("Stokes"). The individual that Stokes retained to be Murex's company man was defendant Micky Peck ("Peck").

Plaintiff has alleged in the complaint that one or more of the defendants are at fault for his injuries (either directly as result of their own conduct or vicariously) on account of his not having a safe place to work and being directed to follow unsafe working practices.

Before the court now are two motions in limine, one brought jointly by Stokes and Peck seeking to exclude from evidence certain opinions of Mr. Karrow, Peterson's vocational expert, relative to Peterson's alleged past and future wage loss. The other is a motion by Peterson seeking to exclude rebuttal facts and opinions offered by Murex's engineering expert relative to certain assumptions made by Karrow, either explicitly or implicitly, in arriving at his opinions with respect to past and future wage loss.

## II. DISCUSSION AND ORDERS

### A. Motion to exclude from evidence opinions of Peterson's vocational expert

According to Karrow's expert witness disclosure, his training and work experience is primarily in the field of vocational rehabilitation, training, and placement. In this case, in addition to offering testimony about jobs that might be available to Peterson given assumed physical limitations and what rates of pay may be available for those job, Karrow is prepared to offer

opinions and conclusions with respect to Peterson's past and future wage loss.

Karrow's expert report sets forth some of the figures he relies upon in making his estimate of past and future wage loss, but not all. Some can only be determined by back calculating from other amounts set forth in the report. The same is also true for some of the assumptions that Karrow makes; some are explicit while others are implicit. Finally, the basis for some of the amounts and assumptions is uncertain. In particular, the court notes the following:

- Karrow states Peterson was earning $2,441 per week at the time of the accident. It is unclear what Karrow relies upon for this amount. There is no indication that Karrow examined Peterson's tax returns, W2 earning statements, pay stubs, bank records, or WISCO payroll records. In another portion of the report, Karrow states he was told by Peterson he was earning $31.50 per hour, but it is not clear whether Peterson claimed this was his base pay, pay for overtime hours, or what he believed to be an average hourly rate based upon both regular and overtime hours. If the basis for the $2,441 per week earnings that Karrow uses is Peterson's statement that he was earning $31.50 per hour, this would mean that Karrow has assumed that Peterson would be working 77.5 hours week (*i.e.*, $2441/$31.50=77.49).

- Karrow first calculates Peterson's past wage loss for the fourteen weeks he was off work following the accident. Karrow states that the loss during this period was $34,174 based upon multiplying fourteen weeks times the assumed wage of $2,441 per week. Karrow then calculates the wage loss for the approximately 32 weeks he returned to work for WISCO doing light duty work. Karrow states Peterson was earning only $18.00 per hour and working only 40 hours per week during his period,

3

resulting in weekly wage of $720. Again, the source of this information is uncertain. Karrow then states that, when comparing the $720 per week he was earning while working for WISCO on light duty following the accident to the $2,441 he was earning at the time of the accident, this resulted in a net wage loss per week of $1,721 or approximately $55,072 for the 32-week period.

- Karrow next states that Peterson returned to Minnesota and tried some other jobs, but was not able to do the work on a sustained basis, but at age 33 was able to work as a cook, earning $13.00 per hour and working 40 hours per week. Karrow then calculates both the remaining past as well as future wage loss from this point forward based upon Peterson earning $520 per week as a cook even though Karrow opines that the most of the jobs that Peterson could perform given his physical and educational limitations likely would result in somewhat less weekly earnings.

- In making his remaining calculations of past and future wage loss, Karrow states Peterson had work life expectancy of 37 years. He offers no basis for this assumption other than Peterson's statement that he would have continued to work in the oilfields until age 70. Also, necessarily implicit in the calculations that follow is that work would have been available to Peterson in the oilfields for the next 37 years and that Peterson would otherwise be able to perform the physically demanding work even at an advanced age. Karrow offers nothing to support these assumptions.

- Karrow next takes the $2,441 he claims Peterson was earning per week at the time of the accident, and compares that to the $520 per week he states Peterson was now

earning, and states Peterson has suffered a loss of weekly earnings of $1,921. He then, without setting forth his actual calculation, claims this amounts to a yearly wage loss of $99,892. However, the only way to get to this figure is to multiply the $1,921 weekly wage loss by 52. Karrow then states that, with a work life expectancy of 37 years, this amounts to a future potential wage loss of $3,696,004. Again, Karrow does not set forth his calculation but this number appears to be the product of $99,982 times 37.

- Necessarily implicit in these calculations leading up to the claimed wage loss of $3,696,000 is the assumption that, for the next 37 years, Peterson would work in the oilfields every week of the year with no break for holidays and no downtime for lack of work or bad weather, particularly during the winter. Also, if the basis for the $2,441 per week earnings in the oilfield is Peterson earning $31.50 per hour and working 77.5 hours per week, then necessarily implicit in Karrow's calculations is not only that he would work every week for the next 37 years but also that he would work 77.5 hours every week for the next 37 years with no vacations or other breaks for the large number of hours being worked on a weekly basis. Karrow offers no explanation for why these assumptions are reasonable—at least not explicitly. He does claim that Peterson was training for a supervisory position that would have allowed him to earn $3.00 to $5.00 per hour more than what he was making at the time of the accident. Perhaps, his unstated assumption is that he would have achieved this position and that this would somehow make up for his other assumptions that are absurd on their face. However, Karrow has not identified in his

5

report what this supervisory position was. Further, he has not attempted to calculate what the supervisory person would have earned on a yearly basis based upon assumptions that have some tether to reality.

- Karrow does not stop with these calculations. He then inflates the potential wage loss of $3,696,004 by assuming that Peterson would earn future increases in pay over the 37 year period in question at least equivalent to what the Social Security Administration has averaged over the past ten years for annual cost of living adjustments, which he states is 1.3% per year. However, there is no mention of why SSA's cost of living adjustments are a suitable proxy for future wage increases. Then, without setting forth his actual calculations, Karrow states that this yearly increase results in a potential future wage loss of $4,769,072.

- In offering his opinion as to future wage loss, Karrow appears not to have discounted the future wage loss to a present value amount.

- Karrow also offers an alternative yearly wage loss of $104,052 based upon the difference between yearly earnings of $126,932 (apparently $2,441*52) and yearly earnings based upon Peterson earning $11.00 per hour for a 40-hour work week. Karrow states that the latter represents what he likely would be able to earn based on jobs available to him that match physical limitations that he assumes Peterson has as well as his educational limitations. Karrow states that, with a work life expectancy of 37 years remaining, this alternative amount of wage loss would be $3,849,924. This number has likewise not been reduced to present value. Also, it appears to suffer from the same questionable assumptions set forth above.

Stokes and Peck contend that the Karrow's testimony with respect to both past and future wage loss should be excluded for several reasons. One is that Karrow, as vocational specialist with no formal economics education, is not qualified to render an estimate of future, if not also past, wage loss. Another is what Stokes and Peck contend are speculative or not adequately supported assumptions, including: (1) his apparent reliance upon Peterson for the amount he was earning at the time of the accident as opposed to actual documentation; (2) the assumption that Peterson could have worked until age 70; (3) the assumption that Peterson could have obtained an unspecified supervisory position; and (4) the assumption that Peterson would have been able to maintain consistent employment for 37 years in the oilfields despite the likelihood of the past history of booms and busts repeating itself. Finally, Stokes and Peck point to the failure to reduce the potential wage loss to present value.

Peterson argues that an expert need not possess a college degree in the field for which an opinion is being offered and can qualify as an expert based upon less formal training as well as experience. Peterson contends that Karrow has the requisite experience based upon his many years of making vocational assessments. According to Peterson, since these assessments include evaluating past and future earnings, this qualifies Karrow to render opinions with respect to past and future wage loss. Peterson further argues that Karrow has relied upon accepted sources for his information and assumptions, including an interview with Peterson, Peterson's medical history and records, Peterson's past work history, published data from the U.S. Department of Labor, and SSA data for cost-of-living adjustments. Peterson does not specifically address the failure to reduce the estimated future wage loss to present value, apparently relying upon his general argument that any potential deficiencies should go to the weight of Karrow's testimony but not its admissibility. Finally, Peterson argues that

Karrow's testimony would be of assistance to the jury in evaluating his past and future wage loss.

While it is true that an expert can gain the necessary qualifications to provide expert testimony through experience or by education that is less formal than that obtained by earning a college degree, the court has serious concerns about whether Karrow is qualified to render some of the opinions he has proffered in his expert report as well as whether there is an acceptable basis for a number of the assumptions he has made. These concerns are grounded here upon two things. The first is the lack of any apparent training, formal or otherwise, bearing upon the factors that typically are considered in making estimates of future wage loss over a long period. See, e.g., Smith v. M.V. Woods Const. Co., 764 N.Y.S.2d 749, 751 (App. Div. Sup. Ct. 2003) ("Plaintiffs' expert was qualified by training and experience as a vocational rehabilitation expert, thus enabling him to assess plaintiff's vocational abilities . . . [citations omitted]. Nothing in this record, however, suggests that his area of expertise includes assessing past and future loss of earnings, past and future loss of household services or future medical expenses, all of which are generally the subject of expert testimony by an economist . . . [citations omitted] ."). The second is the highly questionable assumptions he appears to have made. See, e.g., Cole v. Homier Distributing Co., Inc., 599 F.3d 856, 866 (8th Cir. 2010) (trial court did not err in excluding expert's damage calculations that were factually and methodologically flawed and thereby provided little assistance to the jury); Elcock v. Kmart Corp., 233 F.3d 734, 756-57 (3d Cir. 2000) (trial court erred in allowing testimony by an economist with respect to future wage loss that was based upon assumptions not supported by the record).

Also, the court is skeptical about allowing an expert to offer a calculation of future wage loss that does not discount the estimated future wage loss to present value absent some plausible

explanation for why that would not be necessary given the other assumptions in the calculations.[1]
This is because North Dakota law requires the jury to discount future damages to present value. See, e.g., Armstrong v. Miller, 189 N.W.2d 688, 693-94 (N.D. 1971); Geier v. Tjaden, 74 N.W.2d 361, 365-67 (N.D.1955) And, allowing an expert to calculate future wage loss, including assuming future wage increases, with some purported precision and not reducing the claimed future wage loss to present value (or offering an acceptable explanation for why one is not necessary based on the assumptions made) runs an undue risk of the jury giving more weight to the number the expert has testified to than it deserves under the circumstances.[2]

As for Karrow's estimate of past wage loss, he appears to do nothing more than "chalkboard" that loss based upon other information that presumably will be offered in evidence. It is not clear that his expertise is necessary for these calculations, which appear to be well within the ability of average jurors to make. Further, there may also be questionable assumptions involved in his estimates of past wage loss, including the number of hours and/or weeks Peterson would have worked on a consecutive basis without any break, even under the relatively short times under consideration.

Based upon these concerns, the court **GRANTS IN PART** the Stokes and Peck motion in limine (Doc. No. 128). The court will not permit Karrow to express opinions with respect to Peterson's past and future wage loss until the court can consider the matter outside the presence of the jury, which may include taking testimony. Consequently, the court **ORDERS** Peterson's counsel

---

[1] An expert might try to offer an opinion that the anticipated increases in wages in a particular case would coincidentally equal the appropriate discount rate such that the two would cancel each other out. See, e.g., Tanzler v. Burlington Northern, 608 F.2d 796, 802 (8th Cir. 1979).

[2] To be clear, the issue is not whether a plaintiff in all instances must offer expert testimony to reduce claimed future wage losses to present value. The North Dakota Pattern Jury Instructions instruct the jury that it must do so. See NDJI C-70.52. Rather, the issue is whether the court should permit an expert to offer to the jury calculations of future wage loss without reducing the claimed damages loss to present value.

(1) to obtain a ruling from the court before offering any testimony from Karrow as to his calculations and opinions with respect to past and future wage loss, and (2) not to mention during opening argument or otherwise any opinions or anticipated testimony by Karrow on these points without first having obtained a ruling from the court out of he presence of the jury.

**B.     Motion to exclude from certain rebuttal opinions of Murex's engineering expert**

Murex has stated that it may offer certain rebuttal opinions and assessments that have been made by its engineering expert, Terry Brittenham, P.E. in response to the opinions offered by Karrow with respect to plaintiff's past and future wage losses. Peterson moves to exclude from testimony Brittenham's rebuttal opinions, claiming that he lacks the necessary qualifications and that there is not an adequate foundation for opinions.

One set of opinions that Brittenham offers are his conclusions about what Peterson was earning as of the day of the accident based upon his review of certain documents. Here, the court agrees with Peterson that the interpretation of these documents do not require Brittenham's expertise and would not be aided by it. Murex can rely upon the documents themselves to the extent the documents are relevant.

Brittenham also opines that Peterson's claim that he earned $31.50 per hour as a rig hand is "ludicrous." While Brittenham has some experience in working in the area and hiring personnel, the court is not convinced at this point that Brittenham is qualified to offer testimony with respect to what rig hands were making, much less that there would be an adequate foundation for the testimony. Consequently, a final decision on this point will be deferred.

Brittenham is also poised to provide testimony about the ups and downs of the oil industry in rebuttal to the apparent claim by Peterson that he would have remained employed in the Bakken

for an extended period of time.  While it does appear that Brittenham has some knowledge about the economics of the oil industry on a national basis, his experience in the Bakken appears to be more limited.  Further, it not clear that his purported opinions are anything more than impressionistic as opposed to being grounded in actual economic data.  For these reasons, the court will defer any final decision on these points.

Finally, Brittenham is prepared to testify that a cook working on the North Slope in Alaska was earning $30 per hour.  This observation appears to be founded upon passing knowledge of what one cook was earning with little knowledge about the particular circumstances that might bear upon why the salary was at that hourly amount.  Further, the court is not convinced that what a cook might be earning on the Alaskan North Slope is of particular relevance to this case.  Consequently, while this too will be deferred, the likelihood of the court allowing this testimony under any circumstance is remote.

Based upon the foregoing, the **GRANTS IN PART** Peterson's motion in limine (Doc. No. 131).  Brittenham will not be permitted to testify about his review of the documents he contends reflects Peterson's true salary at the time of the accident.  As for the remainder of Brittenham's rebuttal opinions and statements bearing upon Peterson's claims of past and future wage loss, the court **ORDERS** that *all counsel* are prohibited from introducing this evidence or making reference to it during opening argument or otherwise without first obtaining a ruling from the court out of the presence of the jury as to its admissibility.

Dated this 17th day of April, 2019.

*/s/ Charles S.  Miller, Jr.*
Charles S.  Miller, Jr., Magistrate Judge
United States District Court
