**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Adam Peterson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER ON CROSS-MOTIONS** |
| vs. | ) | **FOR SUMMARY JUDGMENT RE** |
| | ) | **MUREX'S THIRD-PARTY COMPLAINT** |
| Murex Petroleum Corporation, | ) | **AGAINST WISCO, INC.** |
| Mickey Peck, company man, | ) | |
| Stokes and Spiehler, Stokes and Spiehler | ) | |
| Onshore, Inc., Earl Britzenhoff, Company | ) | |
| Man, and Phoenix Operating Company, | ) | |
| | ) | Case No. 1:17-cv-165 |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Murex Petroleum Corporation, | ) | |
| | ) | |
| Defendant and | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WISCO, Inc., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## I.    BACKGROUND

In this action, plaintiff Adam Peterson ("Peterson") is suing to recover damages for an injury

he sustained on April 15, 2012, while working as a derrick hand for third-party defendant WISCO,

Inc.  At the time of the accident, WISCO, Inc. was doing rehabilitative work on an oil well operated

by defendant and third-plaintiff Murex Petroleum Corporation ("Murex").  Specifically, the work

on the day of the accident was rod removal.  Plaintiff was injured when his arm became entangled

in the rods while he was in a basket up in the derrick.

1

In addition to contracting with WISCO, Inc. to perform the rehabilitative work, Murex engaged the services of two companies who each provided a person to represent Murex at the wellsite with respect to the work being performed by WISCO, Inc. In oilfield parlance, the onsite representative for Murex is referred to as the "company man." One of the firms that Murex engaged to provide it with a company man was defendant Phoenix Operating Company ("Phoenix"). The individual retained by Phoenix for this purpose was defendant Earl Britzenhoff ("Britzenhoff"). The other firm engaged by Murex was defendant Stokes and Spiehler ("Stokes"). The individual that Stokes retained to be Murex's company man was defendant Micky Peck ("Peck").

Plaintiff has alleged in the complaint that one or more of the defendants are at fault for his injuries (either directly as result of their own conduct or vicariously) on account of his not having a safe place to work and being directed to follow unsafe working practices. Among other things, plaintiff contends Murex's company man directed that work on the job should continue despite it being too windy for safe operation and instructed that he perform his work in an unsafe manner.

Plaintiff has not sued his employer WISCO, Inc. presumably because of the immunity provided by North Dakota workers' compensation law. While plaintiff has not sued WISCO, Inc., Murex has, contending in its third-party complaint that WISCO Inc. is required to provide Murex with a defense and indemnity from the claims being made by Peterson.

Murex contends that its right to a defense and indemnity by WISCO, Inc. arises out of a master services agreement entered into between Murex and Williston Industrial Supply Company (herein "Williston Industrial Supply" or "WISCO") dated February 8, 2010 ("Murex-WISCO MSA") and, more specifically, Section 7, which reads as follows:

7. INSURANCE AND INDEMNITY:

7.1     Contractor shall at all times while operations are conducted hereunder carry insurance of types and in minimum amounts as shown on the attached Exhibit "A," "Minimum Insurance Requirements" with insurers satisfactory to Murex, unless an officer of Murex Petroleum Corporation has consented to Contractor's being a self-insurer as to any one or more the risks as to which coverage is required in such Certificate of Insurance. Within ten (10) days after signing this agreement or before performing any work and/or Services hereunder, whichever is sooner, Contractor will furnish evidence to Murex of the required coverage on a Certificate of Insurance.

7.2     Contractor agrees to protect, defend, and indemnify and save Murex harmless from and against liability, loss, damage or expense by reason of any suits, claims, demands, judgments and causes of action caused by Contractor, its employees, agents or any subcontractor, arising out of or in consequence of the performance of this agreement or any Service Agreement entered into pursuant to the terms hereof, except that in no instance shall Contractor be held responsible for reservoir loss or damage, nor for any liability, claim, demand, or cause of action attributable solely to the negligence of Murex. This provision requires Contractor to protect, defend and indemnify and save Murex harmless for concurrent negligence, including that part, if any, of such concurrent negligence attributable to Murex.

This indemnity agreement by Contractor shall be insured by Contractor with insurers and in amounts satisfactory to Murex, except as to those risks as to which an officer of Murex has consented to Contractor's being a self-insurer.

(Doc. No. 26-1, pp. 1–2).

Relevant to what follows, the owner of WISCO, James R. Scheele, decided in 2011 to sell the company to Omni Energy Services ("Omni"). The sale was in the form of a purchase of assets, rather than a stock sale. To purchase the assets Omni or one of its subsidiaries caused a new corporation to be formed—defendant WISCO, Inc. The Asset Purchase Agreement ("WPA") dated April 14, 2011, was between Williston Industrial Supply and Scheele as the sellers and WISCO, Inc., as the purchaser. (Doc. No. 26-10).

Nominally included in the asset purchase was all of WISCO's existing contracts along with an assumption of liabilities. (Id., pp. 4–5, 17–18, 22, 43). One of the schedules to the WPA listed the customers with whom WISCO had existing master service agreements. Murex was one of the listed customers. (Id., p.124). Also, in another schedule, Murex was listed as being WISCO's

largest customer in the years 2009 and 2010.  (Id., p. 134).

Prior to the asset sale, Williston Industrial Supply often referred to itself as WISCO.  In fact,

it did so in the Murex-WISCO MSA, which provided in relevant part:

> This is an agreement made this 8th day of February 2010 between MUREX PETROLEUM
> CORPORATION hereinafter called "Murex" and WISCO, herein after called "Contractor,"
> . . . .

(Doc. No. 26-1, p. 1).

WISCO, Inc. was aware that Williston Industrial Supply was using WISCO as another name

for the company at the time of the asset purchase.  In fact, WISCO, Inc. actually purchased Williston

Industrial Supply's right to use the name or mark "WISCO" as well as the right to use the full name

of "Williston Industrial Supply Corporation."  (Doc. No. 26-10, p. 5).

Following the asset purchase and continuing through the date of the accident in this case,

there are numerous instances in which WISCO, Inc. used the name WISCO or Williston Industrial

Supply Corporation to refer to it operations, including documents sent to or exchanged with Murex.

(Doc. Nos. 26-15, 26-47, 26-48, 26-49).  As set forth above, this was WISCO, Inc.'s right.

However, for the reasons discussed later, this might very well have consequences with respect to

WISCO, Inc.'s contention that it was not bound by the Murex-WISCO MSA at the time of the

accident giving rise to Peterson's claims in this case.

Before the court now are cross-motions for summary judgment with respect to Murex's third-

party claims against WISCO, Inc.  This is not the first case to address whether Murex is entitled to

a defense and indemnity pursuant to the Murex-WISCO MSA after the sale of assets to WISCO, Inc.

There is currently pending in state court a personal injury case brought by another WISCO

employee, Robert Todd Simmons, for injuries he sustained on October 26, 2011, while working at

a Murex wellsite ("Simmons state action"). In that case, the state court ruled on summary judgment (1) that WISCO, Inc. was bound by the terms of the Murex-WISCO MSA as of the date of the accident in that case, which postdated the sale of the assets, and (2) that Murex is entitled to an immediate defense by WISCO, Inc. with respect to plaintiff's claims against Murex. (Doc. Nos. 26-26, 26-28, 26-29). The decision of the state district court, however, is not yet final. According to the state court docket, trial is scheduled to commence on January 6, 2020.

## II.    LEGAL STANDARD

This court is well familiar with the law governing motions for summary judgment as reflected in Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) and Fed. R. Civ. P. 56.

## III.    DISCUSSION

WISCO advances several arguments for why it owes no obligation to Murex, or at the very least, that no present obligation is owed. These arguments will be addressed separately below.

### A.    WISCO, Inc.'s argument that the Murex-WISCO MSA does not apply by its terms since there was no written supplemental agreement invoking it

As it was written, the Murex-WISCO MSA contemplated that there would be a separate written "Service Agreement" covering each job that is subject to the MSA. In relevant part, the Murex-WISCO MSA provides:

I. MASTER CONTRACT

1.1    This agreement shall control and govern all work performed and services rendered by Contractor under subsequent written supplemental agreements for any type of service or work performed on or about wells or leases, including but not limited to labor, technical services and the repair, maintenance of Installation of materials and equipment, hereinafter referred to as "Service Agreements," and shall be deemed to enter into and become a part of all such Service Agreements. No subsequent variance from, amendment to or modification of this agreement shall be binding upon Murex unless it is in writing and expressly provides that it is intended as a variance, amendment or modification and is executed by an officer of Murex Petroleum Corporation.

5

1.2     Each Service Agreement shall be signed by Murex and Contractor and shall be given a Service Agreement contract number. Each Service Agreement shall state with specificity the work and/or services to be performed and the cost thereof.

2. RIGHTS AND OBLIGATIONS

2.1     This agreement does not obligate either Murex or Contractor to enter into any Service Agreement with the other but this agreement, together with any subsequent Service Agreement, shall control and govern any type of work and/or services agreed to be furnished by Contractor and shall define the rights and obligations of Murex and Contractor.

(Doc. No. 26-1, p. 1) (bolded language in original omitted).

There is no dispute in this case that a written Service Agreement was not entered into between Murex and WISCO, Inc. for the work being performed by WISCO at the time of the injury to Peterson. Because there was no separate Service Agreement, WISCO, Inc. contends the Murex-WISCO MSA by its terms does not apply, including the indemnity provision relied upon by Murex. Out of all of the arguments made by WISCO, Inc., this one is the most troubling given the express language of the Murex-WISCO MSA.

While it appears the North Dakota Supreme Court has not discussed the characteristics of an oilfield master service agreement, it would likely agree with those courts that have characterized these agreements as providing a framework for future agreement and, typically, are not binding with respect to the work to be performed without more. See, e.g., Matte v. Zapata Offshore Co., 784 F.2d 628, 630–31 (5th Cir. 1986) ("Matte") (the master service agreement was not a binding contract but "'merely sets out the rules of the game in the event the parties decide to play ball.'") (quoting Page v. Gulf Oil Corp., 775 F.2d 1311, 1315 (5th Cir. 1985)); Austin Maintenance & Const., Inc. v. Crowder Const. Co., 742 S.E.2d 535, 546–47 (N.C. App. 2012) (same); Mobil Oil Corp. v. Shlumberger, 598 So.2d 1341, 1345 (Ala. 1992) (same). Rather, most master services agreements require some further agreement or order for work to be performed and it is only when

a further agreement is made or order to perform work issued that there is an actual agreement for any particular work to be performed.  See id.  For example, relying upon these principles, the Fifth Circuit in Matte concluded that a state Oilfield Indemnity Act precluded the enforcement of certain of the MSA's indemnity provisions notwithstanding that the Act was adopted after the execution of the MSA.  The Fifth Circuit reasoned there was no actual agreement until the work order triggering the application of the MSA was issued and that, in this instance, the work order was issued after the passage of the Oilfield Indemnity Act.  Matte, 775 F.2d at 630–31.

Likewise, in Barkley v. Gabriel Brothers, Inc., 829 F.3d 1030, 1038–39 (8th Cir. 2016) ("Barkley"), the Eighth Circuit applying Missouri law held that the district court had not erred in dismissing plaintiff's claim for compensation in accordance with the master agreement because a subsequent written statement of work for the year 2013 had not been agreed upon as required by the master agreement.  More specifically, the court stated:

> Barkley argues that the Agreement did not condition the formation of a statement of work on the execution of a formal contract, but merely contemplated that any statement of work would eventually be reduced to a writing and would include the incorporation clause. The interpretation of a contract is a question of law. Crestwood Shops, L.L.C. v. Hilkene, 197 S.W.3d 641, 648 (Mo. Ct. App. 2006). "When interpreting a contract, the overriding concern of the appellate court is to give effect to the intentions of the parties." Id. In determining the intentions of the parties, "the court first looks to the plain language of the agreement." See TAP Pharm. Prods. Inc. v. State Bd. of Pharmacy, 238 S.W.3d 140, 143 (Mo. 2007) (en banc). The Agreement states that "[t]he services agreed to for each Project shall be designated in a written Statement of Work" and that "[e]ach Statement of Work shall contain" the Agreement's incorporation clause. The use of the word "shall" indicates that a written statement of work is required and that any statement of work must contain the incorporation clause. Accordingly, because the alleged February 21, 2013, draft 2013 statement of work was not part of a written contract and the document did not contain the Agreement's incorporation clause, the district court did not err in granting summary judgment to Gabriel Brothers on Barkley's breach-of-the-Agreement claim.

Id.  WISCO, Inc. argues that the Eighth Circuit's decision is on point with respect to this case.

Murex disagrees, contending that, after the execution of the Murex-WISCO MSA, WISCO

performed hundreds of jobs for Murex and not once was a "Service Agreement" issued. Rather, according to Murex, one of its people would call one of WISCO's people and request work be done on a particular well and that WISCO would then perform the work and bill Murex pursuant to its pricing schedule. Murex contends both parties understood that the work requested was pursuant to the MSA and that the parties by their conduct waived the requirement for a written Service Agreement. Murex contends that this presents a different set of facts than what was at issue in Barkley where no claim of waiver was made—most likely because the facts would not have supported it. In Barkley, the parties had executed the required subsequent agreement for the year 2012 and had exchanged drafts of a subsequent agreement for the year 2013, but did not reach a final agreement. 829 F.2d at 1034–39.[1]

In response to Murex's waiver argument, WISCO, Inc. argues that, since the Murex-WISCO MSA never became operative, there was nothing to waive and also that its language prohibits any waiver unless it is in writing. While these arguments have some force and as tempting as it is to hold Murex to the letter of its MSA, this court is required to resolve these questions based upon what it predicts the North Dakota Supreme Court would do and not what this court believes the result should be. E.g., Integrity Floorcovering, Inc. v. Broan-Nutone, LLC, 521 F.3d 914, 917 (8th Cir. 2008) (when the highest state court has not spoken on a particular issue, the court must predict how it would resolve it by considering "'relevant state precedent, analogous decisions, considered dicta, ... and any other reliable data.'") (quoting Kovarik v. American Family Ins. Group, 108 F.3d 962, 964 (8th Cir. 1997)).

---

[1] While the Eighth Circuit agreed with the dismissal of plaintiff's claim for compensation based on the master agreement in Barkley, it did uphold the submittal to the jury of plaintiff's alternative argument, which was for breach of an oral agreement for the work performed in 2013 and which resulted in a jury award to plaintiff based upon the actual costs of the work performed. Id. at 1041–42.

Here, the court believes the North Dakota Supreme Court would conclude that the parties to the MSA could by their acts and conduct and under the right circumstances waive the requirement in this instance that the trigger of the MSA be in writing and contain the information specified, such that an oral request by Murex for the work and WISCO, Inc. proceeding pursuant to the oral request would then be sufficient. Notably, this would not be inconsistent with the case law cited above in that the MSA would not operative as to any particular work until it was triggered. The only thing changed by the waiver is what is sufficient to constitute the trigger.

This prediction is based upon the North Dakota Supreme Court having held in other cases that parties may waive contractual rights and conditions precedent "by inference from acts or conduct"—even when the contract contains a provision requiring a writing before there can be a waiver. See Savre v. Santoyo, 2015 ND 170, ¶¶ 20–25, 865 N.W.2d 419 (express conditions precedent to the exercise of an option agreement deemed to have been waived by the conduct of the party granting the option even in the face of a clause requiring waivers and modifications be in writing); Van Nice v. Christian Reformed Church of Hull, 232 N.W. 604, 606–07 (N.D. 1930) (requirement in a construction contract that there can be no compensation for extra work or change work without a written order can be waived). Also, while not dispositive, the court notes that the district court in the Simmons state action appears to have ultimately reached the same conclusion in deciding that the requirement in the Murex-WISCO MSA for a written Service Agreement had been waived and that the work in that case was subject to the MSA, including its indemnity provision.

WISCO, Inc. also argues that there is nothing in Murex ordering up the work with respect to any particular well and WISCO or WISCO, Inc. performing the work that is inconsistent with the

MSA and evidence of waiver.  According to WISCO, Inc., the parties did not expressly agree that

no work would be performed absent the issuance of a subsequent written agreement and the

performance of the work pursuant to the oral requests by Murex and the resulting payments for that

work did not require anything in the MSA to complete the transactions.  Murex contends that this,

coupled with what it characterizes as its silence, does not amount to a waiver as a matter of law.

In support of its argument that nothing in the Murex-WISCO MSA required that there be a

written subsequent agreement before *any* work could be performed, WISCO, Inc. cites to part of

Section 2.1 of the MSA and follows the citation with the following parenthetical:

> (stating "This agreement does not obligate either Murex or Contractor to enter into
> any Service Agreement with the other").

(Doc. No. 40, p. 19).  However, the full text of Section 2.1 as set forth earlier reads:

> 2.1    This agreement does not obligate either Murex or Contractor to enter into any
> Service Agreement with the other *but this agreement, together with any subsequent
> Service Agreement, shall control and govern any type of work and/or services agreed
> to be furnished by Contractor and shall define the rights and obligations of Murex
> and Contractor.*

(italics added).  While the court makes no final ruling now, one possible reading of the italicized

language that WISCO, Inc. omitted is that the parties did agree that any subsequent work would be

governed by the MSA, albeit documented by a Service Agreement, and did not contemplate the

MSA applying on an *ad hoc* basis to some jobs and not others.

As for WISCO, Inc.'s second point, while it is true the parties could have proceeded as they

did without having an MSA, there is other evidence that arguably lends support to Murex's

arguments for waiver or, alternatively, that the parties intended that the work subsequently

performed pursuant to oral direction resulted in a series of largely—but not exclusively—oral

agreements that incorporated not only the requirements of the MSA but also WISCO's written price

lists. This evidence includes the following:

- The fact the WISCO and WISCO, Inc. performed numerous jobs without one time the formal requirements for a written Service Agreement being followed.

- The fact that WISCO and WISCO, Inc. agreed that one of the contracts that would nominally be subject to the asset sale was the MSA with Murex.

- The deposition testimony in the Simmons state action by the person who was acting as the general manager for WISCO before and after the asset sale. The court's reading of the deposition testimony is that he understood that the work being performed for Murex in Simmons action (for which there also was no subsequent Service Agreement) was subject to the Murex-WISCO MSA. (Doc. No. 126, p. 13).

- The evidence that the work was priced in accordance with WISCO's price lists.

Finally, there is evidence that may cut both ways depending upon how it may play out and is weighed by the factfinder. At least one such item is the evidence that WISCO and WISCO, Inc. both provided proof to Murex that they had insurance. (Doc. Nos. 37-14, 37-15). Why was this was done? Under WISCO, Inc.'s theory that it (and WISCO before it) simply agreed on an *ad hoc* basis to do work as requested by Murex, that work could have proceeded without the providing of proof of insurance. One possible inference here is that the providing of proof of insurance consistent with the insurance requirements of the Murex-WISCO MSA is evidence that WISCO and WISCO, Inc. believed the MSA to be governing. On the other hand, there is some evidence that, in one or

11

more instances when proofs of insurance had not been timely provided or were out-of-date, Murex communicated to WISCO and WISCO, Inc. that proofs of insurance were required before any work could proceed and the reason Murex gave was that it insurers required it as part of Murex's insurance program and not because it was required by the MSA. (Doc. Nos. 37-14, 37-15).

Under North Dakota law, "the existence or absence of waiver is generally a question of fact" but "becomes a question of law if reasonable persons could draw only one conclusion from the circumstances." Savre, 2015 ND 170, ¶ 20 (quoting Sanders v. Gravel Products, Inc., 2008 ND 161, ¶ 10, 755 N.W.2d 826). In this case, the court concludes there are disputed facts, as well as disputed inferences from undisputed facts, that are material to whether there has been a waiver of the requirements for a formal written Service Agreement and/or whether the subsequent agreements for the individual work assignments incorporated the MSA. Hence, there needs to be a trial on these issues.

**B.     WISCO, Inc.'s argument that it never assumed the obligations under the Murex-WISCO MSA**

WISCO, Inc. argues that it is not bound by the Murex-WISCO MSA because it never effectively assumed its obligations. This argument is premised on what will be referred to herein as the "contract exclusion clause" contained in the WPA, which reads as follows:

> 1.5.     Assignment of Contracts and Rights. Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Purchased Asset or any claim or right or any benefit arising thereunder or resulting therefrom if such assignment, without the consent of a third party thereto, would constitute a breach or other contravention of such Purchased Asset or in any way adversely affect the rights of Buyer or Seller thereunder, Seller and Buyer will use their best efforts (but without any payment of money by Seller or Buyer) to obtain the consent of the other parties to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may request. If such consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement under which Buyer would obtain the benefits and assume the

obligations thereunder in accordance with this Agreement, including sub-contracting, sub-licensing, or sub-leasing to Buyer, or under which Seller would enforce for the benefit of Buyer, with Buyer assuming Seller's obligations, any and all rights of Seller against a third party thereto. Seller will promptly pay to Buyer when received all monies received by Seller under any Purchased Asset or any claim or right or any benefit arising thereunder, except to the extent the same represents an Excluded Asset.

(Doc. No. 26-10, p. 7).

WISCO, Inc.'s argument based upon the contract exclusion clause argument is essentially the following:

- The Murex-WISCO MSA contains the following clause with respect to assignments:

  13. ASSIGNMENT
  13.1 Contractor may not assign or sublet this agreement, or any part hereof, without the written consent of Murex. Any assignment or subletting permitted by Murex shall not relieve Contractor of its obligations hereunder.

  (Doc. No. 26-1, p. 2). Because of this clause, an assignment of the MSA would constitute a breach if it was made without the obtaining the consent of Murex.

- Neither WISCO nor WISCO, Inc. obtained the consent of Murex for the assignment of the Murex-WISCO MSA. Hence, according to the operation of the contract exclusion clause, there was never an assignment of the Murex-WISCO MSA to WISCO, Inc.

Murex contends that this argument is a nonstarter because Murex did consent to the assignment by a letter to WISCO, Inc. dated November 4, 2015, after Murex became aware WISCO, Inc. might be raising this as an issue. WISCO, Inc. argues that this after-the-fact consent cannot result in what terms a "retroactive assignment." Murex, in turn, disagrees, arguing that, under another provision of the WPA, there was an immediate assumption of liabilities by WISCO, Inc. under the contracts that nominally were subject to the asset purchase as of the date of closing and that the language of the contract exclusion clause contemplated that the necessary consents would

13

be obtained following closing. Murex argues that these points, coupled with the lack of any express deadline in the WPA for when any necessary consents had to be obtained, renders its consent effective.

While the court has some initial impressions with respect to whose arguments are more meritorious, the court will not wade further into thicket of these contract-based arguments now because Murex has alternative arguments that may render these contentions moot. And, since the court has concluded there must be a trial with respect to the issues of waiver and/or what the subsequent agreement for the work at issue was, judicial economy supports trying Murex's alternative arguments in response to WISCO, Inc's contention that it never assumed the obligations of the Murex-WISCO MSA at the same time.

Murex has alternatively argued that WISCO, Inc. is estopped from contending it had no liability based upon a purported lack of assumption of the Murex-WISCO MSA because, according to Murex, (1) it was never informed of the sale of the assets and (2) WISCO, Inc. continued to operate using the name WISCO and/or Williston Industrial Supply following the sale and through the date of the accident. As referenced earlier, Murex has offered numerous examples of WISCO, Inc.'s continued use of the name WISCO and Williston Industrial Supply post the WPA in transactions with Murex and otherwise.

WISCO, Inc. does not dispute that it continued to use the names WISCO and Williston Industrial Supply Company. In fact, as noted earlier, it had purchased the right to do so. WISCO, Inc. also agrees it cannot point to any particular communication in which it or WISCO expressly informed Murex of the sale. WISCO, Inc. does, however, point to several documents which it claims gave Murex constructive notice of the sale, including (1) insurance certificates reflecting a

change of insurers, insurance agents, and giving a different street address for WISCO, and (2) a document establishing workers compensation for "WISCO, Inc." Also, WISCO, Inc. points to two documents generated by Murex that it contends demonstrate that Murex was aware that it was dealing with a new entity. The first document is a letter from Murex to WISCO dated prior to the WPA that includes Murex's Vendor ID Number for WISCO along with WISCO's Tax ID Number. The second is a virtually identical letter sent after the WPA, which this time is addressed to WISCO, Inc. The second letter references a different Murex Vendor ID Number for WISCO and a different Tax ID Number.

While the court agrees the evidence proffered by WISCO, Inc. does raise an *inference* that Murex *might* have been put on notice at a sufficient level of authority within Murex that something had changed and the further (albeit weaker) inference that it was dealing with a new entity, such that it needed to be concerned about whether the Murex-WISCO MSA was still binding. However, there is the countervailing evidence. This includes the fact that the named party in the Murex-WISCO MSA was WISCO and WISCO, Inc.'s continued use of that name following the consummation of the WPA. Further, to the extent any thought was given to the use of WISCO, Inc., one reasonable conclusion with Williston Industrial Supply Corporation have frequently referred to itself as WISCO was that it simply decided to change its formal corporate name to WISCO, Inc. There are other possibilities as well. While WISCO, Inc.'s evidence is underwhelming, the court is not prepared to conclude now that no reasonable factfinder could find in favor of WISCO, Inc. with respect to whether Murex was put on notice of the corporate change and its possible ramifications in terms of the Murex-WISCO MSA.

Finally, based upon evidence discussed earlier, the court believes that WISCO, Inc. may very

15

well have waived the protection of the contact exclusion clause vis-a-vis WISCO and assumed the obligations of the Murex-WISCO MSA notwithstanding the lack of an earlier Murex consent to the assignment. Potentially bearing upon this issue, is whether WISCO or WISCO, Inc. actually sought to obtain consents for the assignments of *any* of the more than eighty master service agreements that nominally were the subject of the asset purchase, many of which the court suspects would have had restrictions upon assignment comparable to that contained in the Murex-WISCO MSA.

      C.      **WISCO, Inc.'s argument that the relevant indemnity language of the MSA did not require it to provide Murex with an immediate defense**

The indemnity language of the Murex-WISCO MSA is the same as in the Murex-Phoenix MSA and WISCO, Inc. makes the same argument that Phoenix has made in this case that any claim for a defense and indemnity is premature given that causation and negligence have not been determined. While the court agrees that the determination of whether any indemnity is owed must await a determination of causation and negligence, the same is not true for the duty to defend. For the reasons expressed in the court's ruling on Murex's motion for summary judgment with respect to its cross-claim against Phoenix, WISCO, Inc. has an immediate obligation of providing a defense to Murex assuming it is bound by the Murex-WISCO MSA. See Peterson v. Murex Petroleum Corporation, No.1:17-cv-165, 2019 WL 1759810 (D.N.D. Apr. 19, 2019). However, whether WISCO, Inc. is bound by the Murex-WISCO MSA remains to be determined.

## IV.    ORDER

Based upon the foregoing, the cross-motions for summary judgment by Murex and WISCO with respect to the claims being made by Murex in the third-party complaint (Doc. Nos. 24 & 39) are **DENIED**. The court will set a date for a trial on the third-party complaint as well as on any unresolved cross-claims between Murex and the other parties.

**IT IS SO ORDERED**.

Dated this 25th day of April, 2019.

*/s/ Charles S.  Miller, Jr.*
Charles S.  Miller, Jr., Magistrate Judge
United States District Court
